IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 27, 2022

## JACOB TATE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 114319     G. Scott Green, Judge**

_____

## No. E2022-00147-CCA-R3-PC

_____

The petitioner, Jacob Tate, appeals the denial of his petition for post-conviction relief, which petition challenged his 2018 guilty-pleaded convictions of especially aggravated kidnapping and rape, arguing that he was deprived of the effective assistance of counsel and that his guilty pleas were not knowingly, voluntarily, and intelligently entered. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and CAMILLE R. MCMULLEN, JJ., joined.

Gregory P. Isaacs and J. Franklin Ammons, Knoxville, Tennessee, for the appellant, Jacob Tate.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ashley McDermott, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Knox County Grand Jury charged the petitioner by presentment with one count of rape of a child, one count of aggravated sexual battery, one count of contributing to the unruly behavior of a minor, and one count of contributing to the delinquency of a minor for offenses committed against the victim in February 2016. The Anderson County Grand Jury then charged the petitioner with one count of rape of a child, one count of aggravated sexual battery, one count of especially aggravated kidnapping, and one count of conspiracy to commit rape of a child. Pursuant to a plea agreement with the State, the Knox County presentment was amended to add charges of especially aggravated kidnapping and rape. The petitioner then pleaded guilty to the added charges in exchange

for a total effective sentence of 22 years' incarceration and dismissal of all the remaining charges in both Knox and Anderson Counties.

At the guilty plea submission hearing, the State indicated, that, had the case gone to trial, Tennessee Bureau of Investigation ("TBI") Special Agent Jason Legg would have testified "that in February of 2016, he became involved with an investigation that began after [the] 12-year-old [victim] was reported missing in Anderson County, Tennessee." Following the issuance of an Amber Alert, the petitioner telephoned the TBI tip line to report "that he was lost, and while he was lost, he had accidentally encountered [the victim] while driving" and "that he had picked up [the victim] and gave her a ride to Rockwood, Tennessee, where he dropped her off." Authorities recovered the victim at the Walmart in Oak Ridge shortly after 11:00 p.m. on February 8, 2016. The victim told the police that the petitioner had picked her up at her Anderson County residence on February 7, 2016, and "that she and [the petitioner] had engaged in sexual intercourse and that he had dropped her off in Oak Ridge afterwards. Based on this information, [the victim] was transported for a rape kit to be completed." TBI forensic testing "confirmed the presence of spermatozoa" in the victim's underwear, and further testing established that "in the sperm fraction, the DNA profile was consistent with a mixture of at least three individuals. The minor contributor of the profile was consistent with [the victim's] standards. And [the petitioner] was identified as the major contributor."

The State indicated that the victim would have testified that she met the petitioner "on the Internet through the Kik Messaging application on" February 7, 2016, at a time that "she wasn't getting along with her mother and she wanted to run away." The State indicated that the "messaging would be introduced to show the messages that went back and forth between the parties." The victim would have testified that she asked the petitioner to pick her up at her residence and that he

> did pick her up on the night of February 7th of 2016, and they drove around for a while. She wasn't really sure where she was. And she asked [the petitioner] how far he would drive her. [The victim] would testify that [the petitioner] asked what he would get in return for driving her and that [the petitioner] told her that he wouldn't drive her around anywhere anymore unless she had sex with him.

The victim would have testified that she told the petitioner "that she didn't want to have sex with him. And he said that he was going to leave her in Rockwood if she didn't. [The victim] would testify that she had no other ride, she didn't know where she was, so she did have sex with" the petitioner. The petitioner "drove her to his house . . . in Knox County in his truck," "escorted her inside of the house and into his bedroom," "laid her on the bed

and told her to lay down . . . next to him." The petitioner forced the victim to remove her clothing by telling her that "she had to because he had given her a ride." The victim, who was only 12 years old at the time, "would testify that she felt that she had no option but to have sex with" the petitioner. She would have testified that she told the petitioner "that she didn't want to do this, but she was also afraid not to comply. And she did, in fact, have vaginal sex with [the petitioner]. Afterwards, she tried to go to the bathroom, but [the petitioner] would not allow her to do so, stating that she might wake up his brother." The victim would have testified that she asked the petitioner "to drop her further out of Knoxville, but he told her he needed to go to work. And he said he would call somebody to give her a ride." The petitioner eventually "left the victim in the Shoney's parking lot in Oak Ridge, where she was ultimately handed off to another male that [the petitioner] had been in communication with."

In an audio and video recorded interview, the petitioner initially "told Agent Legg that he did call the 1-800-TBI-FIND number on February 8th to report that he had been in the area of Exit 350, on a back road . . . off of I-40, in his truck when he came upon the young girl that he had seen in the Amber Alert." The petitioner "later recanted this statement and told the agent that that actually wasn't true. He stated that he met the victim on meetme.com." He admitted to Agent Legg that he picked the victim up from her Anderson County residence on February 7, 2016, and drove her to his "Knox County residence and had sex in his truck, according to his statement, parked in the driveway of 9527 Denning Lane." The petitioner "told Agent Legg that he didn't want [the victim] to stay at his house, so he drove her to Oak Ridge and dropped her off with a male he knew as Stu" and "that he and Stu had communicated by telephone calls regarding" the victim. The defendant consented to the collection of his DNA.

During the plea submission hearing, the then 22-year-old petitioner told the court that he had attended high school at Hardin Valley Academy but dropped out in his senior year and obtained his general education diploma. He stated that he could read and write without difficulty, had not ingested drugs or alcohol within 24 hours of the proceeding, did not take any medication, and had no issues understanding the court proceeding. The petitioner told the court that no one had forced, coerced, or threatened him into entering his pleas and that the plea agreement announced by the State was the only incentive offered in exchange for his pleas. The petitioner agreed that his trial counsel had discussed the terms of the plea agreement, the plea documents, and the repercussions of waiving his rights and pleading guilty. Nevertheless, the trial court thoroughly explained the rights that the petitioner would waive by agreeing to plead guilty.[1] The petitioner

---

[1] The colloquy in this case was exceedingly thorough and more than satisfied the requirements of Rule 11.

indicated that he understood the waiver of his rights as explained by both his counsel and the court.

In September 2018, the petitioner wrote a letter to the trial judge asking "to appeal my plea deal on the grounds of improper counsel." He told the court that his trial counsel forced him to "take the deal" by telling him that the trial court "would be mad at me" and would impose a "'harsher sentence'" and revoke the petitioner's bond. The petitioner also alleged that his counsel, who told the petitioner that "he was not qualified to take this case" because "he was not a criminal lawyer," "rarely spoke to me" and "denied me a mental evaluation after being informed, repeatedly, that I can not make choices on my own and I have always needed either my aunt or grandmother to help me." The trial court treated the handwritten letter as a pro se petition for post-conviction relief and appointed counsel to represent the petitioner. Following the appointment of counsel, the petitioner filed an amended petition for post-conviction relief, reiterating the claims of ineffective assistance of counsel and adding a claim that his guilty pleas were not knowingly, voluntarily, and intelligently entered because they were induced by counsel's ineffective assistance. The petitioner then retained counsel, who filed a second amended petition for post-conviction relief that further fleshed out the petitioner's claims of ineffective assistance of counsel and involuntary guilty plea.

At the November 2021 evidentiary hearing, trial counsel testified that he was licensed to practice law in 1990 and had maintained "a general practice since day one." Additionally, trial counsel also worked part-time for the district public defender during his "first few years of practice." After that time, the percentage of his practice devoted to criminal cases ranged between 20 and 40 percent. Counsel said that he had conducted "several" jury trials in Tennessee and had represented defendants in "a lot of cases involving" "sexual allegations." He could not recall the precise number of clients he had represented who had been charged with rape of a child.

Counsel testified that he was retained to represent the petitioner on both the Knox County and Anderson County cases involving the victim. He said that he reviewed the presentment, the applicable statutes, and the sentencing exposure with the petitioner. He obtained discovery materials and met with the petitioner "several times," estimating that "[i]t was probably about" 10 times "if you count the appointments at my office and the times we were here meeting at the courthouse." Upon questioning by the court, counsel estimated that he met with the petitioner "seven or eight times at my office and two or three times at the courthouse, and all for different lengths of time." Trial counsel said that the petitioner "might have met with my legal assistant on other occasions where he was looking at the discovery because of the protective order."

-4-

Trial counsel recalled that he reviewed "a few offers" from the State with the petitioner and that "the final one was maybe the third that we went through." He said that he thought the petitioner was receptive to accepting a plea offer, adding that the petitioner "was more interested in what the plea offer would require him to serve versus what he could potentially get if he went to trial." Counsel acknowledged that the petitioner "wasn't happy to plea[d] guilty, but . . . I think he understood what he was up against and . . . how this plea benefitted him." The petitioner ultimately accepted the State's offer and pleaded guilty on June 7, 2018. Counsel testified that he did not recall speaking to any of the petitioner's family following the guilty plea submission hearing.

During cross-examination by the State, trial counsel testified that a flood at his law office had destroyed the petitioner's case file, which would have contained any motions that were filed, all the discovery materials, case notes, and other things of that nature. Consequently, he was forced to rely entirely on his recollection of the case. Counsel said that he entered into plea negotiations with the State with the petitioner's permission with the ultimate goal of "trying to find something he could plea to that would give him less time." Counsel testified that the offer that the petitioner ultimately accepted allowed for concurrent service of the sentences and disposed of all the remaining Knox County and Anderson County charges, which charges carried "a potentially substantial amount of time." Counsel said that he and the petitioner discussed the agreement, "just weighing all the factors," and that the petitioner's "motivation for taking it was . . . all the charges that were dismissed in return for locking it down to a much smaller amount of time."

Brenda Daughtery, the petitioner's aunt, testified that she and her mother had helped the petitioner's mother raise him and that the petitioner "just had a really tough time." He attended school regularly and had good grades until the eighth grade. Ms. Daughtery said that the petitioner was "not logical" and that "he's very immature for his age, and that's my personal opinion," acting "more like he's on a young teenage level than he is an adult level."

Ms. Daughtery testified that she did not learn about the charges "until it pretty much made the news." Ms. Daughtery assisted the petitioner in retaining trial counsel, who was recommended to them by a friend of her daughter. Ms. Daughtery said that she attended "[t]he majority of" the petitioner's meetings with trial counsel but that "his stepfather at the time went to a few." She specifically recalled attending "at least three or four" meetings with trial counsel at his office. Ms. Daughtery added that counsel "mainly talked to [the petitioner] by himself on the sentencing" but "did talk one time in front of me about it, and I . . . questioned a lot of the stuff that he was telling" the petitioner. Ms. Daughtery testified that counsel told the petitioner "that that was in his best interest, to take the plea deal." She recalled that on the day of the plea submission hearing, the petitioner

-5-

told trial counsel "that he did not want to sign the plea deal" because "[h]e didn't feel comfortable signing it." Ms. Daughtery claimed that counsel "told him, quote: You're going to piss off the judge, and you're going to get more time." She said that the petitioner "was very upset," so counsel "told him that he would come in and assess the situation, and he would come back and let him know what he should do." Counsel returned not "even five minutes" later and "told him that it was in his best interest to sign, and [the petitioner] told him that he did not want to." Ms. Daughtery said that, at that point, she asked counsel, "'If this was your son, would you tell him to sign . . . the plea deal?' And he said, 'I would.' I said, 'Well, I don't believe you.'" Ms. Daughtery testified that she told the petitioner that she "was behind him 100 percent whatever he decided to do." Ultimately, the petitioner accepted the offer and pleaded guilty.

Ms. Daughtery recalled that the petitioner called her "either the day after or that following Monday" after entering his pleas and told her "that he wanted to withdraw the plea deal, and I told him I would get in contact" with trial counsel. Ms. Daughtery said that she telephoned counsel's office and spoke to "the receptionist, paralegal, whatever she is, that does all of his paperwork." The woman "said that he was out of the office, which he was a lot when I would call, but she said that . . . she would get him to call me back." She testified that counsel did not return her call despite her telephoning the office two more times. Ms. Daughtery said that, to her knowledge, counsel did not communicate with the petitioner about his desire to withdraw the pleas.

The post-conviction court asked Ms. Daughtery if she understood that the petitioner's case would not "just go away if I set aside this plea," that the petitioner was facing a minimum sentence of "25 years day for day, 100 percent," and that the evidence included the testimony of "a 12-year-old girl saying that he had sex with her" and "his DNA's in her underwear," and Ms. Daughtery said that she understood.

During cross-examination, Ms. Daughtery agreed that the petitioner had attended school through the 12th grade and had obtained his GED. She also agreed that the defendant was not in any special education classes. Ms. Daughtery said that the petitioner admitted to her that he and the victim "had met up and that they [had sex], but he was not aware of her age" because the victim "had told him that she was 18." She conceded that she knew that the defendant's lack of knowledge regarding the victim's age was not a defense.

Ms. Daughtery agreed that trial counsel told the petitioner "that he was facing a considerable amount of time" on the charges and that counsel provided them with the discovery materials, which were voluminous. Ms. Daughtery conceded that she was present at the guilty plea submission hearing when the trial court explained to the petitioner his rights and informed him that the decision whether to plead guilty belonged to the

-6-

petitioner alone. She also admitted that she heard the petitioner say, under oath, that he understood the charges and that it was his decision to plead guilty. Ms. Daughtery said that the petitioner told her that he wanted to withdraw his pleas "[b]ecause he felt bullied into accepting the plea." She said that she called counsel to tell him as much but never actually spoke to counsel about the issue because counsel did not return her call.

The petitioner testified that he dropped out of Hardin Valley Academy in the 12th grade and obtained a GED and then a job at the Jiffy Lube in Farragut. He said that after he retained trial counsel, he met with the attorney "[a]t his office maybe five [times] at most." Counsel "was present for all except one" of the meetings, and at that meeting his paralegal "went over the discovery." The petitioner said that counsel reviewed the sentencing exposure with him but conveyed only a single plea offer to him. The petitioner insisted that he told trial counsel "I did not want to take a plea deal, that I wanted to go to trial" and said that counsel "didn't really know what to say. It was kind of like he was shocked by what I had said." The petitioner admitted that he signed the plea agreement but claimed that trial counsel did not discuss the document with him. He said that counsel "showed me the paper and told me that he got me a good deal at 22 years at a hundred, and I initially took the paper and was going to sign it, but I hesitated." He said that he "handed the paper directly back to him and told him I did not want to take this plea deal." The petitioner testified that trial counsel told him "that he was going to go speak with the D.A. about it, and then he left." Later, counsel returned and told the petitioner that

> if I went to trial, if I went in the courtroom and told the judge
> that I wanted to go to trial, that I would piss him off. He was
> going to sentence me to harsher things, that he was going to
> revoke my bond and put me in jail that day, and it would be
> best if I took it if I wanted to see my family outside of prison
> ever again.

The petitioner said that counsel's statement caused him to feel scared, pressured, and coerced into accepting the plea offer. The petitioner maintained that he could not recall the trial court's asking him whether he felt pressured or coerced and that he would not have admitted as much to the court in any event "[b]ecause I was afraid of making him mad."

The petitioner testified that, after entering his pleas, he contacted Ms. Daughtery "within the first week" and "told her that I didn't want to take the plea deal and that I wanted to withdraw it." He said that he asked her to convey his wishes to trial counsel. Despite this, trial counsel did not contact him about withdrawing the pleas.

Upon questioning by the court, the petitioner testified that he understood that, should the court set aside the pleas, "it puts this back to square one not only in Knox County

-7-

but Anderson County as well." The court also advised the petitioner that it was the court's policy that "if I set aside an agreed disposition, I don't take anymore agreements[.] It's either go to trial or plead to the indictment." Additionally, the court warned the petitioner that if convicted of rape of child, he faced a minimum of "25 calendar years day for day. There will be no parole" and that he "could be sentenced up to 40 years day for day in custody."

During cross-examination, the petitioner said that he lied to the court "[o]n the plea date" because "I didn't feel like I had a choice." The petitioner acknowledged that he understood the charges and potential punishments, those rights he waived by pleading guilty, and the terms of the plea agreement. The petitioner claimed, contrary to his testimony during direct examination, that no one ever informed him of the potential punishments for any of the charged offenses. The petitioner said that he did not know the precise nature of the Anderson County charges because "I waived the right to formal reading of my indictment." He claimed that the dismissal of the charges in Anderson County "was irrelevant to me." The petitioner admitted that he had sex with the 12-year-old victim and that he knew that his DNA had been found in her underwear but nevertheless claimed that he "never believed myself to be guilty." He said that he did not know what he might tell a jury about the offenses. He admitted that the trial court told him that no one could force him to plead guilty and that he knew that the decision whether to plead guilty "has to be on me." He acknowledged that, during the plea colloquy, he told the trial court that he had personally made the decision to plead guilty.

The petitioner testified that he made the decision that he wanted to withdraw his pleas after "[s]omebody in jail had told me" that that was an option. He could not recall that person's name, saying, "[W]e was on the van to the detention facility together." The petitioner said that he "wasn't aware that I had to have grounds" to withdraw the plea. He claimed at the hearing, however, that he should be permitted to withdraw his plea on grounds that his trial counsel "told me I had to plea that day" but clarified that counsel meant that he had to plead that day if he intended to plead at all. He added that although counsel did not specifically tell him that he had to plead guilty, "he wasn't giving me any other option." The petitioner conceded that he understood the terms of the plea agreement and that having his sentences aligned concurrently was "a good thing." He admitted that sentence alignment "was important" because it meant he would spend less time in jail. He said that trial counsel told him that he "was looking at over like three to four hundred years" but maintained that he "would have rather went to trial like I wanted to" instead of accepting the 22-year plea offer. The petitioner insisted that he believed that a jury would find him not guilty but said that he had "no idea" how he could evade conviction given that he admitted having had sex with the 12-year-old victim and that his DNA was in her underwear.

-8-

During redirect, the petitioner said that it was trial counsel's responsibility to develop a defense and take the case to trial.

At the conclusion of the hearing, the post-conviction court warned the petitioner about the consequences of being allowed to withdraw the extremely favorable plea agreement in this case. The court, observing that, should the charges be reinstated, "you could be a very old man before you got out of custody," took a recess to allow the petitioner "to think about this." The court added, "We all have to make tough decisions in life, but sometimes those tough decisions, it's the best of two bad choices. My belief is you made the best choice among two bad alternatives." The court elected to recess the proceedings for a time "to give you the opportunity to keep pursuing this petition if you want to. If you do, I'll put down an order." The court also warned the petitioner that if the court granted post-conviction relief and set aside the petitioner's pleas, the court would "not accept[] another agreed disposition. You're either going to trial or you're going to plead to the indictment, which means you got to beat it at trial because if you don't, you're looking at a minimum 25 years in custody."

When court reconvened two weeks later, the State presented the testimony of Assistant District Attorney General Joanie Stewart, who handled the petitioner's trial case for the State. Ms. Stewart testified that she made more than one plea offer in the petitioner's case. She recalled that, in conjunction with the assistant district attorney general prosecuting the case against the petitioner in Anderson County, a decision was made "that to save the child from testifying in multiple counties on her rapes that Knox County would take the lead . . . and if he pled to the charges here, that the cases in Anderson County will be dismissed." She explained that the petitioner "did not have sex with the child in Anderson County" but "handed her off and transported her to other individuals in Anderson County that had sex with her, and . . . physically beat her." Ms. Stewart described the petitioner's demeanor during the guilty plea submission hearing as "unrepentant." She recalled that the petitioner "did not make an allocution." Ms. Stewart stated that the 12-year-old victim and her family were cooperating with the State, that DNA evidence "from three men [including the petitioner] was recovered from the child's body," that the petitioner "had admitted to having sex with the child" during a recorded interview, that "text message evidence" and "a social media MeetMe app" confirmed "communications between" the petitioner and the victim. Citing this evidence, Ms. Stewart classified the State's case against the petitioner as "very strong."

During cross-examination, Ms. Stewart recalled that she extended at least three plea offers to the petitioner "in the course of a conversation" with trial counsel. She said that she did not recall trial counsel's indicating to her on the day of the plea that the petitioner was reluctant to go forward. She added, "[W]e had a signed plea agreement at that point, and from my recollection, the discussion revolved around the timing of the plea

-9-

that day." She said that she remembered that "there was no allocation and there was no remorse."

At the conclusion of the hearing, the court took the petition under advisement. In its written order denying post-conviction relief, the post-conviction court found that the transcript of the Rule 11 hearing supported a conclusion that the petitioner "was making a conscious, knowing, and voluntary choice to waive his right to trial and accept a twenty-two (22) year sentence." The court also found "that the agreement negotiated by trial counsel significantly benefitted" the petitioner. The court observed that the evidence of the petitioner's "guilt is overwhelming." The court concluded that "no credible evidence supports the assertion that the [p]etitioner's plea was not voluntarily entered with a full awareness of the consequences that emanated from the decision to plead guilty."

In this timely appeal, the petitioner contends that his guilty pleas were not knowingly, intelligently, and voluntarily entered and that trial counsel was ineffective for failing to file a motion to withdraw the petitioner's guilty pleas when the petitioner asked him to do so.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the

-10-

petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

In the context of a guilty plea, the petitioner must establish that "counsel's constitutionally ineffective performance affected the outcome of the plea process" by establishing "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see Hicks v. State*, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

Apart from whether a guilty plea is the product of ineffective assistance of counsel, it is invalid if otherwise made unknowingly or involuntarily. "Whether a plea was knowing and voluntary is an issue of constitutional dimension because '[t]he due process provision of the federal constitution requires that pleas of guilty be knowing and voluntary.'" *State v. Wilson*, 31 S.W.3d 189, 194 (Tenn. 2000) (alteration in original) (quoting *Johnson v. State*, 834 S.W.2d 922, 923 (Tenn. 1992)). A plea "may not be the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats.'" *Wilson*, 31 S.W.3d at 195 (alterations in original) (quoting *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969)); *see also State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003) (citing *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993)).

The record supports the denial of post-conviction relief in this case. The petitioner testified that he understood the nature of the charges against him and the potential punishments, that he understood the terms of the plea agreement and the rights he was waiving by pleading guilty, and that he told the trial court during the Rule 11 hearing that he had personally made the decision to plead guilty. The transcript of that hearing overwhelmingly establishes that the petitioner's pleas were knowingly and intelligently entered. Moreover, that transcript coupled with the evidence presented at the evidentiary

hearing established that trial counsel worked hard to negotiate a plea agreement that gave the petitioner a much shorter term of incarceration than what he faced if he had been convicted at a trial, the dismissal of all the charges in Anderson County, and allowed the petitioner to avoid a child rape conviction altogether. The agreement was a boon to the petitioner, and, consequently, counsel strongly encouraged the petitioner to accept the agreement, accurately informing the petitioner that he would receive a much harsher sentence should he be convicted at trial. We agree with the post-conviction court that "no credible evidence supports the assertion that the [p]etitioner's plea was not voluntarily entered with a full awareness of the consequences that emanated from the decision to plead guilty."

As to the petitioner's claim that trial counsel should have filed a motion to withdraw the guilty pleas when the petitioner asked him to do so, the record does not contain any evidence that the petitioner's request was actually communicated to trial counsel. The petitioner testified that he told Ms. Daughtery that he wanted to withdraw his pleas, and Ms. Daughtery testified that she telephoned counsel's office and spoke with counsel's receptionist or legal assistant. To be sure, neither the petitioner nor Ms. Daughtery testified that they ever communicated directly with trial counsel regarding a motion to withdraw the pleas, and trial counsel testified that he had no recollection of having received any communication from the petitioner or the petitioner's family following the entry of the pleas.

Even assuming, however, that trial counsel was aware of the petitioner's request, the petitioner cannot prevail because he has failed to establish that he was prejudiced by the failure to file the motion. To establish that he was prejudiced, the petitioner must establish that the trial court would have granted a motion to withdraw. Importantly, a guilty-pleading defendant "does not have a unilateral right to later withdraw his plea either before or after sentencing," and, in consequence, "bears the burden of establishing sufficient grounds for withdrawing his plea." *State v. Phelps*, 329 S.W.3d 436, 444 (Tenn. 2010). When a motion to withdraw the plea is filed "[a]fter sentence is imposed but before the judgment becomes final," the defendant bears the burden of establishing that he should be permitted "to withdraw the plea to correct manifest injustice." Tenn. R. Crim. P. 32(f)(2). Tennessee courts have allowed the withdrawal of guilty pleas to prevent manifest injustice when, among other things, "the plea 'was entered through a misunderstanding as to its effect, or through fear and fraud, or where it was not made voluntarily'" or "the defendant was denied the effective assistance of counsel in connection with the entry of the plea." *State v. Crowe*, 168 S.W.3d 731, 742 (Tenn. 2005) (citations omitted). The petitioner testified that he did not have any grounds for withdrawal in mind at the time he told Ms. Daughtery that he wanted counsel to file a motion to withdraw the pleas. A guilty plea should not be withdrawn merely because the defendant has had a change of heart. *Crowe*, 168 S.W.3d at 743; *see also Ray v. State*, 451 S.W.2d 854, 856

(Tenn. 1970). He said that, at the time of the hearing, his grounds for withdrawal would have been that counsel coerced him into pleading guilty. Because the evidence adduced at the evidentiary hearing clearly established that the petitioner's pleas were knowingly, voluntarily, and intelligently entered and that he was not deprived of the effective assistance of counsel, he cannot show that he should have been permitted to withdraw the pleas to correct a manifest injustice. *See, e.g.*, *Robert Jason Burgess v. State*, No. M2011-01324-CCA-R3-PC, 2012 WL 3090832, at *11 (Tenn. Crim. App., Nashville, July 31, 2012) ("Because the trial court rejected the factual premise upon which the [p]etitioner contends he sought to withdraw the pleas, he has not shown that he was prejudiced by trial counsel's actions.").

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE